# **EXHIBIT 2**

EFiled:  May 22 2012  4:07PM EDT
Transaction ID 44408446
Case No. 7559-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| HAITHAM J. KOUSA, ROBERT MALLANO, and RICK STEINMETZ, directly on behalf of themselves and all others similarly situated, and derivatively on behalf of China Natural Gas, Inc., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| QINAN JI, ZHIQIANG WANG, LAWRENCE W. LEIGHTON, FRANK WAUNG, YANG XIANG DONG, and CHINA NATURAL GAS, INC., | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) |
| CHINA NATURAL GAS, INC., | ) ) |
| Nominal Defendant. | ) |

Civil Action No. _____

### VERIFIED SHAREHOLDER CLASS ACTION AND DERIVATIVE COMPLAINT

Plaintiffs Haitham J. Kousa ("Dr. Kousa"), Robert Mallano ("Mallano"), and Rick Steinmetz ("Steinmetz"), by and through their undersigned counsel, allege upon personal knowledge as to themselves, and upon information and belief (including the investigation of counsel and review of publicly available information) as to all other allegations, as follows:

### SUMMARY OF THE ACTION

1.      This action arises from a pattern of self-dealing and financial impropriety at China Natural Gas, Inc. ("CHNG" or the "Company") that caused the value of the Company's shares to decline by more than 85%, led to the delisting of the Company's shares from the NASDAQ Global Market, and has now prompted the filing of a civil enforcement action against the Company and the Chairman of its Board of Directors ("Board") by the Securities and Exchange Commission ("SEC").

2.     On September 21, 2011, the Company's Board publicly reported, following an internal investigation, that CHNG's Chairman and then-Chief Executive Officer ("CEO"), Qinan Ji ("Ji"), had caused CHNG to engage in undisclosed related-party loans that funneled millions of dollars of Company money to Ji's relatives and affiliates (the "Related Party Loans").  Ji had previously concealed the nature of the Related Party Loans through false statements to the Board and its representatives.  The NASDAQ Stock Market LLC ("NASDAQ") halted trading in CHNG shares the same day.

3.     Faced with Ji's manifest self-dealing and unlawful conduct and the imminent threat of delisting by NASDAQ absent adequate remedial measures, however, the Board abdicated its duties by retaining Ji as Chairman and installing a long-time Company employee and Ji associate, Shuwen Kang ("Kang"), as CEO.

4.     In response, NASDAQ advised the Company on November 9, 2011 that it would proceed to delist its shares, a decision that became effective April 30, 2012.

5.     The Board's actions in response to the discovery of the Related Party Loans and threat of delisting by NASDAQ are rendered all the more indefensible by Ji's pattern of prior wrongdoing.  During the 18 months prior to the disclosure of the Related Party Loans, numerous other instances of unauthorized transactions by management, self-dealing, and violations of generally accepted accounting principles ("GAAP") under Ji's leadership caused analysts to repeatedly question the Company's governance.  These improprieties drove an over 80% decline in the Company's stock price.

6.     The misconduct admitted by the Company prior to discovery of the Related Party Loans included (i) Ji's receipt of a $19.6 million payment in connection with the Company's acquisition of Lingbao Yuxi Natural Gas Co., Ltd. (the "Yuxi Acquisition"), (ii) issuance by

CHNG on instructions from Ji of loans totaling approximately $14.3 million without Board approval, (iii) CHNG's acquisition of businesses and assets totaling $14.1 million without Board approval, and (iv) the Company's failure to correctly report a $17.7 million loan – representing a more than 50% increase in the Company's outstanding debt – in the applicable Form 10-Q and other SEC filings.

7.    Following the Company's admissions of these acts of self-dealing and mismanagement in a series of announcements through 2010, Ji instituted a near-blackout on news regarding the major growth initiatives at the Company in early 2011.  Most significantly, under his leadership, the Company failed to report on the progress and status of CHNG's liquefied natural gas production facility (the "LNG Plant"), in which the Company had invested nearly $70 million.  The absence of meaningful disclosures by the Company reversed its prior practice of detailed discussion of the status of the LNG Plant and other initiatives, further undermining investor confidence and impairing the trading price of its stock.

8.    On June 30, 2011, Ji announcing a going-private offer (the "Proposed Transaction") for the Company at $4.25 per share – a deep discount to the Company's trading price earlier in the year, thereby capitalizing on the concerns about management integrity that stemmed from his own misconduct.  The offer was made days after a key milestone for the Company – the commencement of regular production at the LNG Plant – had been achieved, but not publicly disclosed.

9.    Ji's extensive wrongdoing, and the Board's actions in response to it, including the retention of Ji as Chairman of the Company and appointment of a long-time Company employee and Ji associate as CEO, have caused substantial harm to the Company and to its shareholders

directly.  Ji and the other directors continue to control the Company.  Plaintiffs accordingly seek damages and other relief.

## THE PARTIES

10.     Dr. Kousa is a physician residing in Ohio.  From November 8, 2007 to February 18, 2009, Dr. Kousa purchased 52,857 shares of CHNG common stock at a total cost of $734,454, and retains ownership of those shares.  At $1.43, the closing price quoted for CHNG shares on the OTC Bulletin Board system on May 18, 2012, Dr. Kousa's losses totaled more than $650,000 – approximately 90% of his investment.

11.     Mallano is a resident of New York.  He has been a shareholder of CHNG since June 2007.

12.     Steinmetz is a resident of Illinois.  He has been a shareholder of CHNG since November 2009.

13.     CHNG is a Delaware corporation, with its registered agent located at National Corporate Research, Ltd., 615 South Dupont Highway, Dover, Delaware, 19901, and its Principal Executive Offices located at 19th Floor, Building B, Van Metropolis, 35 Tang Yan Road, Hi-Tech Zone, Xi'an, 710065, Shaanxi Province, China.

14.     CHNG carries on its operations through its wholly owned subsidiary Xilan Natural Gas Equipment Co., Ltd and its 100% variable interest entities ("VIE"), Xi'an Xilan Natural Gas Co. Ltd. ("Xi'an Xilan"), Shaanxi Jingbian Liquefied Natural Gas Co., Ltd., Xian Xilan Auto Bodyshop Co., Ltd., Henan Xilan Natural Gas Co., Ltd., and Lingbao Yuxi Natural Gas Co., Ltd.

15.     Defendant Ji is Chairman of CHNG's Board, a position he has held since 2005.  Ji also served as CHNG's CEO from May 2006 through October 4, 2011.  Ji, together with his immediate family, beneficially owns approximately 17.4% of the outstanding shares of CHNG.

16.     Defendant Zhiqiang Wang ("Wang") is Vice Chairman of the Board, a position he has held since 2006.  Wang was formerly CEO of Xi'an Municipal Government Construction Company, where he was in charge of the city's major construction projects, and was previously Vice Mayor of the city of Xi'an, where the Company is based.

17.     Defendant Yang Xiang Dong, also known as "Donald Yang" ("Yang"), is a member of the Board, a position he has held since August 2008.  Yang is also the founding partner and, since 2007, the president of Abax Global Capital ("Abax"), which describes itself as "a leading Hong Kong based asset management firm focused on Asian public and private investments especially in Greater China."  Abax provided $40 million in debt financing to CHNG in 2008, a substantial majority of which remains outstanding.

18.     Defendant Frank Waung ("Waung") is a member of the Board, a position he has held since November 25, 2010.  Waung is Chief Financial Officer of China Pharma Holdings, Inc., a China-based manufacturer of pharmaceuticals, and previously worked in investment banking.

19.     Defendant Lawrence W. Leighton ("Leighton") is a member of the Board, a position he has held since August 2008.  Leighton is a Managing Director of Bentley Associates, an investment banking firm, and previously worked in investment banking at Lehman Brothers, Bear Stearns & Co., and Credit Agricole, among other firms.

20.     Collectively, the individuals identified in paragraphs 15 to 19 above are referred to herein as the "Director Defendants."

21.     By reason of their positions as directors of the Company, Ji and the other Director Defendants owed the Company and its shareholders the fiduciary obligations of loyalty, good faith and due care.  In addition, Ji and the other Director Defendants were obliged to follow the

Company's Code of Ethics ("Code"), which mandates, in relevant part, that accurate and complete corporate records be maintained, and that conflicts of interest be avoided.

22.     Non-party Shuwen Kang has been CHNG's CEO since October 4, 2011. According to the Company's October 12, 2011 Form 8-K filing: "Most recently from 2011, Mr. Kang has been vice president of [Xi'an Xilan], the variable interest entity of one of the Company's major subsidiaries, and is in charge of Xi'an Xilan's business operations. From 2006 to 2010, Mr. Kang served as senior counsel to Xi'an Xilan, responsible for making strategic and business development plans for the Company."

## SUBSTANTIVE ALLEGATIONS

### A.     CHNG's Business and Entry in the U.S. Public Markets via a Reverse Merger

23.     CHNG is an integrated natural gas operator in the People's Republic of China ("China"), primarily involved in the distribution of compressed natural gas ("CNG"), through the CNG fueling stations owned by its VIE affiliate, Xi'an Xilan. In addition, in June 2011, CHNG completed and brought the LNG Plant online. The Company and analysts had cited the LNG Plant, a major project in which the Company had invested more than $68 million, as a key growth driver.

24.     As reported in its most recent periodic filing, the Company has recorded significant growth over the past year. For the quarter ended December 31, 2011, the Company's revenue was $35.9 million, an increase of 32% over the same period a year earlier.

25.     CHNG became a U.S. public company in December 2005 through a "reverse merger" – a process in which a publicly traded shell company merges with a private company seeking to become publicly traded, resulting in the shareholders of the former private company acquiring ownership of the public company.

26.     Reverse mergers allow the private company to be listed on a U.S. stock exchange without undergoing the regulatory scrutiny and mandatory public disclosures that are required in an initial public offering.   Recently, the SEC has raised significant concerns regarding governance at companies based in China that, like CHNG, became publicly-listed through the reverse merger mechanism.

27.     In an April 4, 2011 speech, SEC Commissioner Luis Aguilar cited his concerns about the use of reverse mergers by China-based firms to accomplish "backdoor registration," stating:

> In the world of backdoor registrations to gain entry into the U.S. public market, the use by Chinese companies has raised some unique issues, even compared to mergers by U.S. companies. Two important ones are:
>
> • First, there appear to be systematic concerns with the quality of the auditing and financial reporting; and
>
> • Second, even though these companies are registered here in the U.S., there are limitations on the ability to enforce the securities laws, and for investors to recover their losses when disclosures are found to be untrue, or even fraudulent.
>
> I am worried by the systematic concerns surrounding the quality of the financial reporting by these companies. In particular, according to a recent report by the staff of the Public Company Accounting Oversight Board (PCAOB), U.S. auditing firms may be issuing audit opinions on the financials, but not engaging in any of their own work. Instead, the U.S. firm may be issuing an opinion based almost entirely on work performed by Chinese audit firms. If this is true, it could appear that the U.S. audit firms are simply selling their name and PCAOB-registered status because they are not engaging in independent activity to confirm that the work they are relying on is of high quality. This is significant for a lot of reasons, including that the PCAOB has been prevented from inspecting audit firms in China.

28.     On June 9, 2011, the SEC issued an Investor Bulletin warning investors about investing in companies that enter the public markets through reverse mergers, citing "instances of fraud and other abuses involving reverse merger companies" and specifically cautioning

investors that "some of the foreign companies that access the U.S. markets through the reverse merger process have been using small U.S. auditing firms, some of which may not have the resources to meet its auditing obligations when all or substantially all of the private company's operations are in another country," which it noted "can result in increased risks for investors."

29.     In an accompanying press release, the Director of the SEC's Office of Investor Education and Advocacy further cautioned that "[g]iven the potential risks, investors should be especially careful when considering investing in the stock of reverse merger companies . . . ."

30.     According to a September 29, 2011 news report published by Reuters, the SEC's Chief of Enforcement, Robert Khuzami, stated that the Justice Department was reviewing accounting irregularities at various companies based in China.  The Reuters report further stated that the SEC has established a task force specifically to investigate Chinese companies that enter the U.S. markets via reverse mergers.

31.     Consistent with the concerns raised by SEC Commissioner Luis Aguilar and cited in the SEC's Investor Bulletin, CHNG's Independent Registered Public Accounting Firm at the time that the Related Party Loans were entered into, in early 2010, was Frazer Frost, LLP, which has since disbanded.  On December 20, 2010, the SEC entered a cease-and-desist order against one of Frazer Frost, LLP's predecessor entities, Moore Stephens Wurth Frazer & Torbet LLP, arising from auditing improprieties in connection with another China-based company.

**B.     CHNG Is Listed on the NASDAQ and Thereafter Loses Most
        of Its Value Resulting from Governance-Related Concerns**

32.     CHNG's shares became listed on the NASDAQ Global Select Market in June 2009.

33.     Beginning in early 2010, however, CHNG made a series of disclosures regarding financial and governance improprieties by the Company under Ji's leadership.  In early 2011 – in

the months leading up to the announcement of the Proposed Transaction – the Company sharply curtailed its public disclosures.

34.     As a result, CHNG lost more than 80% of its value between January 2010 and the halt of trading on September 21, 2011, severely underperforming both other Chinese companies and its U.S. downstream peers:



C.     **The Company Acknowledges a Series of Governance
       and Internal Control Failures Beginning in Early 2010**

35.     Beginning in early 2010, CHNG began reporting an array of governance and internal control failures – including self-dealing by Ji, material transactions not authorized by the Board, and GAAP violations that severely undermined market confidence in the integrity of management and quality of the Company's internal controls.

36.     The Yuxi Acquisition.  During a March 11, 2010 analyst call, in response to an analyst's question, Ji acknowledged that an entity that he controlled was the recipient of $19.6 million in cash consideration paid in connection with the 2008 acquisition of Lingbao Yuxi Natural Gas Co., Ltd. – the Yuxi Acquisition.  The Yuxi Acquisition, however, was never reported as a related party transaction.

37.     On the analyst call, Ji (through the Company's then-Acting Chief Financial Officer ("CFO")) asserted three reasons why the cash consideration had been wired to a company which he controlled: (1) "out of the concern for reasons up from personal liabilities. For example, if the owners of the company being acquired . . . would know that they have such a large amount of money into their account, . . . if they have some personal liabilities they have to settle these personal liabilities;" (2) "out of some tax concern by these owners owning this company being acquired;" and (3) "out of some personal safety concern by this owner selling this Lingbao Yuxi Natural Gas Company."

38.     This explanation prompted analyst concern.  Janney Capital Markets ("Janney") noted in a report later that day, "**Yuxi acquisition raises eyebrows**. We are slightly skeptical of management's remarks regarding its controversial Yuxi acquisition in 2008 . . . . This was likely a related party transaction, in our opinion, and should have been disclosed as such." (Boldface in original.)

39.     On November 14, 2011, the Company disclosed that the SEC had initiated an investigation into the Yuxi Acquisition.

40.     The Wang and Juntai Loans.  In May 2010, the Company reported in its Form 10-Q for the quarter ended March 31, 2010 that the Company had made loans in the amount of approximately $14.3 million to Shanxi Juntai Housing Purchase Ltd. (the "Juntai Loan") and Ms. Taoxiang Wang (the "Wang Loan"), allegedly parties with whom the Company did not have a prior relationship.

41.     On a May 10, 2010 analyst call, Ji (again, through the Company's then-Acting CFO) explained the Wang and Juntai Loans as a payoff made in an effort to obtain regulatory approvals.  Ji stated that "we are facing some difficulty in terms of the challenges in China to business, because currently we are trying to apply and submit our applications for the Phase II and Phase III of the LNG factoring for a increase in capacity. So, there are some necessary paper works and approvals involved in some very senior officials. So we do understand that there are -- this inappropriate for a listed company and we understand there are lines that we cannot cross . . . . So, this is the challenge that we do have. And we're trying our best to deal with this."

42.     An analyst report by Roth Capital Partners ("Roth") the following day cited the loan as "inappropriate and it raises concern over the co's corporate governance and internal controls."

43.     In fact, as later admitted by the Company and discussed below in paragraphs 67 to 71, the Wang and Juntai Loans were secretly made to persons related to Ji.

44.     The Unreported Bank Loan and Unapproved Acquisitions.  Three months later, on August 13, 2010, the Company reported that in February 2010, it had obtained a $17.7 million loan from Pudong Development Bank (the "Unreported Bank Loan"), representing a more than

50% increase in the Company's outstanding debt – but had failed to disclose such loan in its Form 10-Q for the quarter ended March 31, 2010, or as a subsequent event in its Form 10-K for 2009, as required by GAAP.

45.     In addition, in connection with the Unreported Bank Loan, Xi'an Xilan, the Company's VIE, pledged its equipment and vehicles located within China to secure the Unreported Bank Loan and guaranteed the repayment of the Bank Loan.

46.     Also on August 13, 2010, the Company disclosed in its Form 10-Q for the quarter ended June 30, 2010, that "key executives" had made the Wang and Juntai Loans, entered into the Unreported Bank Loan, and proceeded with the acquisition of four natural gas fueling stations, valued at $10.5 million, all "without preapproval from the Company's board of directors . . . ."

47.     These disclosures prompted Roth to downgrade the Company to "sell" on August 19, 2010, based on "concerns over the company's corporate governance and internal controls over financial reporting."  The next day, Rodman & Renshaw placed its rating of the Company under review for similar reasons.  A week later, on August 25, 2010, the RedChip equity research firm suspended its price target and rating for the Company based on "reporting and control concerns," citing the August 2010 disclosures, together with the previously-disclosed Related Party Loans.

48.     Additional Unapproved Acquisition.  Six weeks later, on October 1, 2010, the Company disclosed in a Form 10-K/A filing that senior management had also failed to disclose to the Board the $3.6 million acquisition of Hanchun Makou Yuntong Compressed Natural Gas Co., Ltd. in July 2010.

49.     <u>Internal Control Deficiencies</u>.  While the Company's management originally reported that its internal controls were "effective" as of December 31, 2009, the matters identified above led the Company to revise its assessment to find "material weaknesses" as of year-end 2009 and that its "internal control over financial reporting was not effective," as reported in the Company's Form 10-Q filed August 13, 2010.  Each of the Company's periodic reports on Forms 10-K and 10-Q since that date, most recently on April 2, 2012, has reaffirmed the continued existence of "material weaknesses" in its internal controls, rendering its internal controls "not effective."

**D.      Elimination of Meaningful Disclosures Concerning CHNG's Business**

50.     Following the series of disclosures concerning management misconduct and GAAP violations listed above, CHNG's management further undermined investor confidence by implementing a near-blackout on meaningful disclosures concerning its business.

51.     Prior to 2011, the Company regularly provided disclosures to analysts and investors regarding the status of major growth initiatives, in particular the Company's the LNG Plant, the Company's joint venture ("JV") with China National Petroleum Corporation ("CNPC"), and the continued expansion of its CNG fueling station business.

52.     Beginning in early 2011, however, the Company sharply curtailed its disclosures, providing vague and uninformative descriptions of the status of its operations and business prospects in both its SEC filings and on analyst calls.

53.     <u>The LNG Plant</u>. The Company's substantial investment in the then-uncompleted LNG Plant reached $66.8 million as of March 31, 2011 – more than the entire equity value of the Company at its last trading price.  The LNG Plant was cited as the Company's "main component of growth" in a January 2010 report from Janney, and as the Company's "key growth driver" in a November 16, 2010 report from Roth.

54.     In 2010, Ji provided specific forecasts regarding the LNG Plant.  For example, on a May 10, 2010 analyst call, he stated (through the then-Acting CFO), "We accounted for approximately 30% of revenue contribution of the full capacity during the third quarter [of 2010] of the LNG factory and about 50% during the fourth quarter [of 2010], because there are a maximum period for the LNG factory which we think is a relatively a uncertainty. So we want to be very conservative in terms of the forecasting."

55.     By contrast, on May 12, 2011, on the last analyst call before the Proposed Transaction was announced, Ji refused to provide any specifics about the LNG Plant.  Bode Xu, the then-Acting CFO stated, "We have successfully completed a series of test run in the LNG plant. There's no other preparation for production, it's currently difficult to give a natural estimate on the former launch date but please be assured that we will try our very best to launch the plant as soon as possible."

56.     The Company's subsequent disclosures regarding the LNG Plant, however, strongly suggest that it withheld material information regarding the LNG Plant at the time the Proposed Transaction was announced and then obscured the true facts in a later English-language disclosure.

57.     On July 19, 2011, the Company issued an English-language press release announcing that it had "successfully completed trial operation of its Jingbian liquefied natural gas ('LNG') plant on July 16, 2011 and has commenced production."

58.     A Mandarin-language press release three days earlier, however, posted on CHNG's Mandarin-language website, www.xltrq.com, stated that the LNG Plant began production on June 25, 2011 – just days before the Proposed Transaction was announced – and

that July 16, 2011 was, in fact, the date of a formal ribbon-cutting ceremony to celebrate this milestone, attended by a number of prominent government officials.

59.    The JV.    The Company has been similarly opaque about the status of its joint venture with CNPC, a state-owned exploration and production company.  In its January 20, 2010 report, Janney cited the JV, along with the Company's LNG initiatives, as the Company's principal growth drivers.

60.    Subsequently, Ji indicated that the JV was proceeding.  On a May 10, 2010 analyst call, for example, he stated (through the then-Acting CFO David She ("She")), that "[d]uring the first quarter, our joint venture with CNPC Kunlun Natural Gas Company, although received local government approval to build one CNG compressor station and six fueling stations in Pingdingshan Province, which marks the formal launch of the joint venture between China Natural Gas and CNPC in the region." On the same call, She confirmed that "eight company-owned [and] four joint venture" fueling stations was the Company's "target and best estimate" for the year.

61.    By contrast, on a March 16, 2011 call, Ji's answers regarding the JV were vague and evasive.  When asked by analyst Matthew Kantrowitz ("Kantrowitz") of the RedChip equity research firm about whether any new CNG stations were installed in 2010 or would be installed in 2011 and the status of the JV, Ji stated (through a corporate participant), "this is a good question Matthew and we have a good joint venture relationship with CNPC.  And our company is doing well and also we cooperate very well, because CNPC is a state owned company.  So it has very good working attitude.  So, we are looking for an incremental base and in associate, we are going to get the other paper works done and granted permission from the government very shortly.  Thank you."

62.     Kantrowitz further inquired, "Okay. So, just to clarify, there is an expectation that the joint venture will continue and that there should be new stations under the joint venture this year?" Ji's response (through the corporate participant) was, "We are working together and are working together for the, in the future and we work with that. Thank you."

63.     <u>CNG Business</u>.   Finally, from 2011 to the present, the Company has failed to provide any detail regarding expansion of its core CNG fueling station business.   By comparison, during analyst calls on May 10, 2010 and August 16, 2010, the Company stated with specificity the number of new fueling stations that it intended to add during the year.

**E.      The Proposed Transaction**

64.     On June 30, 2011, Ji announced exploration of the Proposed Transaction with a consortium led by Themes Investment Partners, a China-focused private equity firm based in New York.   According to the Company, Ji informed the special committee of the Board responsible for evaluating the Proposed Transaction (the "Special Committee") that "he intended to work together with the consortium to formulate a proposal to acquire all of the outstanding shares of common stock of the Company that he and his affiliates do not currently own through a going private transaction at a proposed price of $4.25 per share in cash."

65.     The $4.25 offer price was at a discount to CHNG's 30-, 60- and 90-day trailing closing prices, and followed the loss of approximately 50% of the Company's market value since March 2011, and approximately 80% since late 2009.   The Proposed Transaction thus would have enabled Ji to directly profit from the matters described in paragraphs 35 to 63 above.

66.     On September 2, 2011, Ji announced that "the exclusive agreement that he entered into with [Themes] terminated on August 31, 2011.   Themes continues to be interested in a potential investment.   Mr. Ji continues to seek out alternative sources of funding for the going-private transaction."

**F.   Disclosure of the Related Party Loans, the Halt in Trading, and the Board's Decision to Preserve Ji's Control over the Company**

67.   Finally, on September 21, 2011, the Company announced in a Form 8-K filing that the Forms 10-Q and 10-K issued for 2010 "should no longer be relied upon due to a failure to correctly disclose as a related party transaction" certain loans – the Related Party Loans – that were made to parties related to Ji, and that the Company would be amending such filings to correct this omission.   The Company further announced that the Board had directed the Company to "undertake remediation measures," including the replacement of Ji as CEO and the engagement of certain advisors and adoption of new internal controls.

68.   According to the SEC's complaint against the Company and Ji, filed last week in the United States District Court for the Southern District of New York, captioned *SEC v. China Natural Gas, Inc.*, No. 12-cv-3824-PGG (the "SEC Action"), Ji "falsely told CHNG's board that the loans involved senior Chinese government officials" and later "continued to conceal the related party nature of the loans from the internal investigators" hired by the Board.   SEC complaint ¶¶ 4, 28, 32.

69.   According to the SEC complaint, Ji's deception included instructing the Company's Internal Audit Chief to conceal the related-party nature of the Related Party Loans, and "[a]s a result, the Internal Audit Chief produced to the internal investigation the false meeting notes he had generated . . . ."   SEC complaint ¶ 32.

70.   As the Company admitted, the Related Party Loans further violated the Company's own Code of Ethics, which requires its directors, officers and employees to avoid conflicts of interest and to disclose any situation that presents the possibility of a conflict of interest.

71.     The Related Party Loans also violated Section 13(k) of the Securities Exchange Act of 1934, which prohibits loans made directly or indirectly to executive officers and directors.

72.     On the same day that the Company issued its Form 8-K filing, September 21, 2011, NASDAQ announced that it had halted the trading of CHNG shares "for 'additional information requested' from the company" and that "[t]rading will remain halted until China Natural Gas, Inc. has fully satisfied NASDAQ's request for additional information."

73.     On October 12, 2011, the Company announced in a Form 8-K filing that the Board had appointed Kang as the Company's CEO and that Ji had resigned as CEO.  According to the Form 8-K, "from 2011, Mr. Kang has been vice president of Xi'an Xilan Natural Gas Co., Ltd. ('Xi'an Xilan'), the variable interest entity of one of the Company's major subsidiaries, and is in charge of Xi'an Xilan's business operations. From 2006 to 2010, Mr. Kang served as senior counsel to Xi'an Xilan, responsible for making strategic and business development plans for the Company."  The Company further disclosed that Ji "will continue in his position as Chairman of the Company's Board and his compensation will not change from what was previously disclosed."

74.     Despite previous repeated instances of self-dealing and other governance failures over more than a year, the Board thus responded to the manifest and egregious breaches of duty detailed above by appointing as new CEO a Company insider who had previously served as an advisor to Ji, and by allowing Ji to retain his position as Chairman of the Company, without any reduction in compensation.

## G.     **The NASDAQ Delisting Determination**

75.     The NASDAQ responded quickly to the Board's decision to preserve Ji's control over the Company by appointing a long-time associate as CEO and allowing Ji to remain Chairman, notifying the Company by letter dated November 9, 2011 that it had determined to

exercise its discretionary authority under NASDAQ Listing Rule 5101 to delist the Company's securities.

76.    In CHNG's Form 8-K filing disclosing the NASDAQ notification, filed six days later on November 15, 2011, it provided a summary of the reasons given by NASDAQ for its decision, as follows:

1.  Loans totaling $14.3 million extended by the Company to relatives and affiliates of Mr. Qinan Ji ("Mr. Ji"), the Company's former Chief Executive Officer, current Chairman and largest shareholder for no business purpose, which benefitted Mr. Ji's relatives and affiliates;

2.  Management's failure to disclose the true nature of the Loans to the Board, Audit Committee, a Special Committee of the Board established to investigate the Loans, and the Company's outside audit firm;

3.  the Company's failure to properly and publicly disclose the related party nature of the Loans in periodic filings with the U.S. Securities and Exchange Commission; and

4.  the lack of adequate internal controls related to the Company's disclosure and financial reporting.

In addition, [NASDAQ] Staff stated an additional basis to delist for failure to comply with Listing Rule 5630, which requires the Company's Audit Committee or other independent body of the Board to review all related party transactions.

77.    In its November 15, 2011 Form 8-K, the Company stated that it had appealed the NASDAQ Staff's determination to the NASDAQ Hearing Panel.

78.    NASDAQ's rules explicitly provide that remedial measures taken subsequent to an initial delisting decision are considered in the appeals process.  *See* NASDAQ OMX Listing Center Appeals Process FAQs (panel "considers information available subsequent to the Panel's decision, including new deficiencies and the cure of prior deficiencies"); NASDAQ Listing Rule 5820(e)(1).

79.     The Board, however, failed to take any further remedial measures.

80.     On March 8, 2012, CHNG issued a Form 8-K announcing that its appeal of the delisting decision to the NASDAQ Hearing Panel had been denied.

81.     On April 20, 2012, NASDAQ filed an SEC Form 25, announcing that the decision to delist the Company's shares had become final, effective April 30, 2012.

**H.      The Board's Manifest Breach of Duty in the Face of Delisting**

82.     The Director Defendants' actions in response to the NASDAQ trading halt, the threat of delisting and NASDAQ's subsequent delisting decision constituted an egregious breach of their duties to the Company's shareholders.

83.     A delisting of a company's shares is well-recognized as a catastrophic event for shareholders, ordinarily severely impairing both a stock's liquidity and trading price.

84.     Listing on a major public exchange such as NASDAQ assures investors that the extensive listing requirements – concerning financial soundness, stability and transparency – are being satisfied.  By contrast, delisting carries with it a stigma of impropriety, which would be especially pronounced in the case of company such as CHNG, where the delisting resulted from the exercise of NASDAQ's discretionary authority under Listing Rule 5101, rather than merely from the Company's failure to comply with non-core requirements such as maintaining a minimum bid price or market capitalization.

85.     In addition, most institutional investors are prohibited from owning shares that are not listed on a public exchange, further contributing to a loss in value and liquidity.  Delisted companies are also unlikely to be covered by analysts, thereby depriving investors and prospective investors of professional insight into the Company and further eroding demand for their shares.

86.     An analysis performed for Plaintiffs by a financial and economic consulting firm, Financial Markets Analysis, LLC ("FMA"), confirms the commonly-held understanding that delisting is a catastrophic event.   FMA's review of all discretionary delisting decisions by NASDAQ under Listing Rule 5101 in two years prior to the CHNG delisting identified 37 securities for which all relevant data were available.   Among these 37 securities, the median share price decline was 81.3%.

**I.**     **Prior Proceedings and Recent Events**

87.     Following announcement of the Proposed Transaction, Dr. Kousa served a books-and-records demand in August 2011, followed by a supplemental demand in October 2011, pursuant to 8 *Del. C.* § 220.

88.     After close to two months of active negotiations, CHNG rejected the demands. Shortly thereafter, the law firm representing CHNG in connection with the books-and-records demands served by Dr. Kousa, Richards, Layton & Finger, informed Dr. Kousa's undersigned counsel that they were no longer representing the Company.

89.     Around the same time, on November 9, 2011, the Company reported on Form 12b-25 that it would not be timely filing its Form 10-Q for the quarter ended September 30, 2011 "due to the fact that the Company changed its legal counsel recently and engaged its new counsel on November 8, 2011, just one day prior to the filing deadline."

90.     According to publicly-filed correspondence between CHNG and the SEC, its principal U.S. counsel prior to November 9, 2011 had been the law firm of Proskauer Rose LLP.

91.     On November 7, 2011, Dr. Kousa commenced an action against CHNG to enforce his books-and-records demands.   After learning of the imminent delisting of the Company's shares by NASDAQ and determining that injunctive relief with respect to NASDAQ was

necessary,[1] Dr. Kousa voluntarily dismissed the books-and-records action and commenced an action in the United States District Court for the District of Delaware (the "District Court Action"), *Kousa v. Ji*, C.A. No. 11-1202-RGA, seeking delay of delisting by NASDAQ, appointment of a receiver for the Company, and expedited discovery in aid thereof.

92.     On March 5, 2012, CHNG moved to stay the District Court Action pending appointment and investigation by a special litigation committee (the "SLC").

93.     According to CHNG's submissions to the district court, the SLC would consist of one member, a partner at a Shanghai law firm.  The Company did not indicate when the SLC would actually be formed or begin its investigation.

94.     On March 19, 2012, the District Court dismissed NASDAQ from the action and denied expedited discovery as moot.

95.     On April 10, 2012, recognizing that no federal question remained and an amended complaint would raise only state law issues, the parties stipulated to dismissal of the District Court Action in favor of proceeding in this Court and the District Court deferred final approval of such dismissal pending the filing of this action.

96.     On May 8, 2012, CHNG announced the resignation of Bode Xu ("Xu"), the Company's CFO.  Xu's departure represents the sixth replacement of the Company's CFO in the past four and a half years.  In December 2007, the Company appointed Lihong Guo as its CFO, replacing Xiaogang Zhu, who had been the Company's CFO since December 2005.  In October 2008, less than one year later, Richard Wu was appointed CFO.  Just seven months later, in May 2009, he was replaced by Veronica Jin Chen.  Seven months later, in January 2010, she was replaced by David She.  By the end of that same year, in December 2010, he left CHNG and was replaced with Xu.

---

[1]  Exclusive federal jurisdiction over NASDAQ exists pursuant to Section 27 of the Exchange Act.

97.     On May 14, 2012, the SEC initiated the SEC Action against CHNG and Ji, principally arising from the Related Party Loans.

98.     Finally, as of the date hereof, the Company is in default on its obligation to file an annual proxy statement, which was due no later than April 30, 2012.

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action as a class action pursuant to Chancery Court Rule 23, individually and on behalf of all present CHNG shareholders, excepting Defendants and their affiliates (the "Class").

100.    This action is properly maintainable as a class action.

101.    The Class is so numerous that joinder of all members is impracticable.  As of March 23, 2012, CHNG had 21,458,654 shares outstanding, and upon information and belief, hundreds or thousands of beneficial owners located throughout the United States and elsewhere in the world.

102.    Questions of law and fact common to the Class predominate over any question affecting only individual members of the Class, and include, among others:

        (a)     whether the Director Defendants have breached their fiduciary duties; and

        (b)     the damages Plaintiffs and the other members of the Class have suffered thereby.

103.    Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs have the same interests as the other members of the Class.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

104.    A class action provides a fair and efficient method for adjudication of the controversy at issue in this action.  The prosecution of separate actions by individual members of the Class would create the risk of (i) inconsistent or varying adjudications with respect to individual members of the Class which would confront Defendants with incompatible standards of conduct, and (ii) adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not party to the adjudications or substantially impair or impede their ability to protect their interests.

105.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.

## DEMAND IS EXCUSED

106.    Plaintiffs are the owners of CHNG common stock and have been the owners of CHNG common stock at all times relevant to the Director Defendants' wrongful course of conduct alleged herein.

107.    Plaintiffs will adequately and fairly represent the interests of CHNG and its shareholders in enforcing and prosecuting its rights.

108.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action because such demand would be futile with respect to each of the Director Defendants.

109.    The Director Defendants are incapable of making an independent and disinterested decision to institute and prosecute this action for the following reasons:

(a)     Defendant Ji is not independent and disinterested because he breached his duties of loyalty and candor to the Company by authorizing and approving the Related Party Loans, later misrepresenting the nature of such loans, and engaging in the other self-dealing conduct set forth in this Complaint;

24

(b)     The Company has admitted that Defendant Ji is not an independent director pursuant to the requirements of the listing standards of the NASDAQ and applicable SEC regulations;

(c)     After disclosure of the related-party nature of the Related Party Loans and Ji's deception of the Board in connection therewith, together with Ji's other self-dealing conduct set forth in this Complaint, the Director Defendants retained Ji as Chairman of the Company, without any reduction in compensation, and appointed a long-time Company employee and Ji associate as CEO.  The Director Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

(d)     Ji has exercised control over the Company through his position as the Chairman of the Board since 2005, together with his direct and indirect ownership of 17.4% of the Company's shares.  He is by far the Company's largest shareholder, and thereby has effective control over the selection and retention of the other Director Defendants as directors of the Company.

110.    The Director Defendants have further conceded that they lack independence and that demand would therefore be futile by announcing their intention to appoint the SLC.

111.    Demand is further excused because the particularized facts set forth above raise a reasonable doubt that the Board's actions were the product of its good faith, informed business judgment.

## COUNT I
## DIRECT CLASS CLAIM FOR BREACH OF FIDUCIARY DUTY
### (Against the Director Defendants)

112.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

113.     The Director Defendants owed and owe CHNG and its shareholders the fiduciary obligations of care, good faith, loyalty and candor.

114.     By preserving Ji's control over the Company in light of the threatened delisting of the Company's shares by NASDAQ, each of the Director Defendants breached his fiduciary duties to CHNG and its shareholders.

115.     As a direct and proximate result of the Director Defendants' breaches of duty, they caused CHNG's stock to be delisted, directly injuring Plaintiffs and the Class.

116.     As a result of the breaches of duty alleged herein, the Director Defendants are liable to Plaintiffs and the Class for damages suffered and to be suffered thereby.

## COUNT II
## DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (Against the Director Defendants)

117.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

118.     Plaintiffs bring this claim derivatively on behalf of CHNG.

119.     The Director Defendants owed and owe CHNG and its shareholders the fiduciary obligations of care, good faith, loyalty and candor.

120.     By preserving Ji's control over the Company in light of the threatened delisting of the Company's shares by NASDAQ, each of the Director Defendants breached his fiduciary duties to CHNG and its shareholders.

121.    As a direct and proximate result of the Director Defendants' breaches of duty, they thereby caused CHNG's stock to be delisted, injuring the Company.

122.    As a result of the breaches of duty alleged herein, the Director Defendants are liable to the Company for the damages suffered and to be suffered thereby.

### COUNT III
### DERIVATIVE CLAIM FOR BREACH OF FIDUCIARY DUTY
### (Against Ji)

123.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

124.    Ji, as Chairman, director, and former CEO of CHNG, owed and owes CHNG and its shareholders the fiduciary obligations of care, good faith, loyalty and candor.

125.    Ji's self-dealing and other conduct described herein breached his fiduciary duties to CHNG and its shareholders.

126.    As a direct and proximate result of Ji's breaches of duty, Ji injured the Company.

127.    As a result of the breaches of duty alleged herein, Ji is liable to the Company for the damages suffered and to be suffered thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the Class, or in the alternative, derivatively on behalf of the Company, demand judgment as follows:

A.    With respect to Count I, ordering that this action may be maintained as a class action and certifying Plaintiffs as Class representatives and their undersigned counsel as Class counsel;

B.    With respect to Counts II and III, authorizing this action to proceed as a derivative action, in the name of the Company;

C.      Declaring that the Defendants have breached their fiduciary duties as alleged herein;

D.      Directing the Defendants, jointly and severally, to account to Plaintiffs and the Class for all damages suffered and to be suffered by them as a result of the wrongs complained of herein;

E.      Awarding Plaintiffs the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of Plaintiffs' attorneys and experts; and

F.      Granting Plaintiffs and the other members of the Class such other and further relief as is just and equitable.

Dated:  May 22, 2012                          **LIEBESMAN LAW, LLC**


**OF COUNSEL**:                               _/s/ Sidney S. Liebesman_
                                              Sidney S. Liebesman (DE Bar ID #3702)
Ethan D. Wohl                                 501 Silverside Road, Suite 2
Allie Lin                                     Wilmington, DE 19809
WOHL & FRUCHTER LLP                           Telephone: (302) 798-1000
570 Lexington Avenue, 16th Floor
New York, NY 10022                            _Attorneys for Plaintiffs_
Telephone: (212) 758-4000

Michael Goldberg
Louis Boyarsky
Elizabeth Gonsiorowski
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150

Francis A. Bottini, Jr.
Albert Y. Chang
CHAPIN FITZGERALD
    SULLIVAN & BOTTINI LLP
550 West C Street, Suite 2000
San Diego, CA 92101
Telephone: (619) 241-4810

**EFiled:  May 22 2012  4:07PM EDT**
**Transaction ID 44408446**
**Case No. 7559-**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| HAITHAM J. KOUSA, ROBERT MALLANO, and RICK STEINMETZ, directly on behalf of themselves and all others similarly situated, and derivatively on behalf of China Natural Gas, Inc., | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| QINAN JI, ZHIQIANG WANG, LAWRENCE W. LEIGHTON, FRANK WAUNG, YANG XIANG DONG, and CHINA NATURAL GAS, INC., | ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) |
| CHINA NATURAL GAS, INC., | ) ) |
| Nominal Defendant. | ) |

Civil Action No. _____

## VERIFICATION AND RULE 23(aa)/23.1(b) AFFIDAVIT OF PLAINTIFF HAITHAM J. KOUSA TO VERIFIED SHAREHOLDER CLASS ACTION AND DERIVATIVE COMPLAINT

STATE OF OHIO                          )
                                                     )  ss:
COUNTY OF CUYAHOGA          )

I, Haitham J. Kousa, depose and say as follows:

1.      I hereby verify that I have read the foregoing Verified Shareholder Class Action and Derivative Complaint and that the factual statements contained therein as to myself are true, and as to all other matters are true to the best of my knowledge, information and belief.

2.      I have not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this litigation, except for (i) such damages or other relief as the Court may award me as a member of the class, (ii) such fees, costs and other payments as the Court expressly approves to be paid to

me or on my behalf, or (iii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

HAITHAM J. KOUSA

Sworn to and subscribed before me
this 22 day of May, 2012

Notary Public

**NOTARIAL SEAL**
**STATE OF OHIO**

Christina M. Culliton
Notary Public, State of Ohio
My Commission Expires
Aug. 15, 2016

- 2 -

EFiled:  May 22 2012  4:07PM EDT
Transaction ID 44408446
Case No. 7559-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| HAITHAM J. KOUSA, ROBERT MALLANO, and RICK STEINMETZ, directly on behalf of themselves and all others similarly situated, and derivatively on behalf of China Natural Gas, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> QINAN JI, ZHIQIANG WANG, LAWRENCE W. LEIGHTON, FRANK WAUNG, YANG XIANG DONG, and CHINA NATURAL GAS, INC., <br><br> Defendants, <br><br> and <br><br> CHINA NATURAL GAS, INC., <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. _____. |

### VERIFICATION AND RULE 23(aa)/23.1(b) AFFIDAVIT OF PLAINTIFF ROBERT MALLANO TO VERIFIED SHAREHOLDER CLASS ACTION AND DERIVATIVE COMPLAINT

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss: |
| COUNTY OF QUEENS | ) |

I, Robert Mallano, depose and say as follows:

1.     I hereby verify that I have read the foregoing Verified Shareholder Class Action and Derivative Complaint and that the factual statements contained therein as to myself are true, and as to all other matters are true to the best of my knowledge, information and belief.

2.     I have not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this litigation, except for (i) such damages or other relief as the Court may award me as a member of the class, (ii) such fees, costs and other payments as the Court expressly approves to be paid to

me or on my behalf, or (iii) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

_Robert C Mallano_
Robert Mallano

Sworn to and subscribed before me
this 21 day of May, 2012

_Jovanna Montejo_
Notary Public

JOVANNA MONTEJO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MO6260139
Qualified in Queens County
My Commission Expires April 23, 2016

- 2 -

EFiled:  May 22 2012  4:07PM EDT
Transaction ID 44408446
Case No. 7559-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HAITHAM J. KOUSA, ROBERT MALLANO,           )
and RICK STEINMETZ, directly on behalf of    )
themselves and all others similarly situated, and  )      Civil Action No. _____
derivatively on behalf of China Natural Gas,  )
Inc.,                                         )
                                              )
                 Plaintiffs,                  )
                                              )
          v.                                  )
                                              )
QINAN JI, ZHIQIANG WANG, LAWRENCE            )
W. LEIGHTON, FRANK WAUNG, YANG                )
XIANG DONG, and CHINA NATURAL GAS,           )
INC.,                                         )
                                              )
                 Defendants,                  )
                                              )
          and                                 )
                                              )
CHINA NATURAL GAS, INC.,                      )
                                              )
                 Nominal Defendant.           )

**VERIFICATION AND RULE 23(aa)/23.1(b) AFFIDAVIT
OF PLAINTIFF RICK STEINMETZ TO VERIFIED SHAREHOLDER
CLASS ACTION AND DERIVATIVE COMPLAINT**

STATE OF ILLINOIS        )
                         ) ss:
COUNTY OF COOK           )

I, Rick Steinmetz, depose and say as follows:

1.     I hereby verify that I have read the foregoing Verified Shareholder Class Action
and Derivative Complaint and that the factual statements contained therein as to myself are true,
and as to all other matters are true to the best of my knowledge, information and belief.

2.     I have not received, been promised or offered and will not accept any form of
compensation, directly or indirectly, for prosecuting or serving as a representative party in this
litigation, except for (i) such damages or other relief as the Court may award me as a member of
the class, (ii) such fees, costs and other payments as the Court expressly approves to be paid to

me or on my behalf, or (iii) reimbursement, paid by my attorneys, of actual and reasonable out-

of-pocket expenditures incurred directly in connection with the prosecution of this action.

_____
RICK STEINMENTZ

Sworn to and subscribed before me
this 21 day of May, 2012

_____
Notary Public

"OFFICIAL SEAL"
Lilly M. Luca
Notary Public, State of Illinois
Cook County
My Commission Expires 07-01-2013

- 2 -